USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1287 No. 97-1382 UNITED STATES OF AMERICA, Petitioner-Appellee, Cross-Appellant, v. MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Respondent-Appellant, Cross-Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. George A. O'Toole, Jr., U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Hill,* Senior Circuit Judge, ____________________ and Pollak,** Senior District Judge. _____________________ ____________________ Jeffrey Swope with whom Matthew P. Schaeffer and Palmer & Dodge _____________ _____________________ _______________ LLP were on brief for respondent. ___ Sara S. Holderness, Tax Division, Department of Justice, with ___________________ whom Loretta C. Argrett, Assistant Attorney General, Donald K. Stern, ___________________ _______________ United States Attorney, and Charles E. Brookhart, Tax Division, ______________________ Department of Justice, were on brief for petitioner.  ____________________ November 25, 1997 ____________________  ____________________ *Of the Eleventh Circuit, sitting by designation. **Of the Eastern District of Pennsylvania, sitting by designation. BOUDIN, Circuit Judge. This case concerns an attempt by _____________ the Massachusetts Institute of Technology to assert the attorney-client privilege and work-product doctrine in response to a document request by the Internal Revenue Service. The most important issue presented is whether MIT's disclosure of certain of the documents to another government agency caused it to lose the privilege. The background facts are essentially undisputed. MIT is a famous university with tax-exempt status under 26 U.S.C. 501(c)(3). In 1993, the IRS conducted an examination of MIT's records to determine whether MIT still qualified for exempt status and to determine whether it was complying with provisions relating to employment taxes and the reporting of unrelated business income. In aid of this examination, the IRS requested from MIT copies of the billing statements of law firms that had represented MIT and minutes of the MIT Corporation and its executive and auditing committees. In response, MIT supplied the documents requested but redacted information claimed to be covered by the attorney- client privilege or the work-product doctrine or both. In mid-1994 the IRS requested that the redacted information be supplied, and MIT declined. At this point the IRS sought to obtain the same documents in unredacted form from the Defense -2- -2- Contract Audit Agency ("the audit agency"), the auditing arm of the Department of Defense. It appears that the same billing statements and possibly some or all of the minutes sought by the IRS had earlier been provided to the audit agency pursuant to contracts between MIT and components of the Department of Defense. The audit agency helps entities in the Department of Defense review contract performance to be sure that the government is not overcharged for services. Not surprisingly, the audit agency often reviews the private contractor's books and records.  In November 1994, the audit agency advised the IRS that it would not turn over the documents provided to it by MIT without the latter's consent, which MIT declines to give. The audit agency had made no unconditional promise to keep the documents secret, but its regulations and practices offered MIT some reason to think that indiscriminate disclosure was unlikely. The IRS then served an administrative summons on MIT in December 1994 seeking specific unredacted minutes of nine meetings of the MIT Corporation and auditing and executive committees in 1990 and 1991, and attorneys' billing statements for almost all legal expenses paid or incurred by MIT from July 1, 1990, through June 30, 1991. 26 U.S.C. 7402(b), 7604(a). When MIT declined to comply, the IRS in early 1996 petitioned the district court to enforce the summons. The -3- -3- district court obtained briefs, heard arguments and considered the matter without an evidentiary hearing on the basis of the declaration filed by the IRS and an affidavit submitted by MIT. In January 1997, the district court issued a memorandum and order enforcing the IRS administrative summons as to the unredacted legal bills and the unredacted versions of most of the minutes sought by the IRS. The district court held that the disclosure of the legal bills to the audit agency forfeited the attorney-client privilege. As to the minutes, the district court said that the privilege remained available because the government had not proved that the minutes had been disclosed to the audit agency. After reviewing the minutes in camera, the court _________ found that three contained privileged material and ordered MIT to turn over the others as unprivileged or because MIT had lost the privilege by disclosing the substance of the minutes in its now unprivileged legal bills.  The district court followed a different path in resolving MIT's work product objection. The court held that neither the legal bills nor the minutes were "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). It ruled that they were therefore discoverable as ordinary business records. Accordingly, the court did not discuss whether work product protection was waived by disclosure to the audit agency. -4- -4- MIT now appeals, arguing that disclosure of the billing statements to the audit agency should not forfeit the privilege; MIT no longer claims work product protection for the billing statements. The government has cross-appealed from the district court's refusal to order production of the three remaining minutes; it says that the burden was on MIT to prove that the minutes had not been disclosed to the audit agency. MIT responds that the privilege was not waived even if the minutes were disclosed to the audit agency, and that the minutes remain protected by the work product doctrine. On an appeal respecting a privilege claim, the standard of review depends on the issue. Rulings by the district court on issues of law are reviewed de novo; fact findings _______ are tested under a clear error standard; and discretionary judgments such as evidentiary rulings are reviewed for abuse of discretion. See United States v. Wilson, 798 F.2d 509, ___ ______________ ______ 512 (1st Cir. 1986). On the principal issue before us-- forfeiture by disclosure--this case goes about as far as possible in posing an abstract issue of law and review is plenary. The question whether MIT forfeited protection in disclosing documents to the audit agency is not governed by any federal constitutional provision, federal statute, or rule prescribed by the Supreme Court. Nor is the enforcement of an IRS summons a matter with respect to which state law -5- -5- supplies a rule of decision. Accordingly, the scope of the privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. See ___ also United States v. Zolin, 491 U.S. 554, 562 (1989). ____ _____________ _____ MIT's Appeal. We begin with the attorney-client _____________ privilege. That privilege has been familiarly summed up by Wigmore in a formula that federal courts have often repeated: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived. 8 J. Wigmore, Evidence 2292, at 554 (McNaughton rev. 1961). ________ The government argues, and the district court agreed, that by its disclosure to the audit agency, MIT waived the privilege to whatever extent that it might otherwise have protected the billing statements and various of the minutes. The attorney-client privilege is well-established and its present rationale straightforward: by safeguarding communications between lawyer and client, it encourages disclosures by client to lawyer that better enable the client to conform his conduct to the requirements of the law and to present legitimate claims or defenses when litigation arises. See Upjohn Co. v. United States, 449 U.S. 383, 389-90 (1981). ___ __________ _____________ -6- -6- Waiver issues aside, the contours of the privilege are reasonably stable. Quite a different scene presents itself when one turns to the problem of "waiver," a loose and misleading label for what is in fact a collection of different rules addressed to different problems. Cases under this "waiver" heading include situations as divergent as an express and voluntary surrender of the privilege, partial disclosure of a privileged document, selective disclosure to some outsiders but not all, and inadvertent overhearings or disclosures. See McCormick on Evidence 93, at 341-48 (J.W. Strong ed., ___ ______________________ 4th ed. 1992). Even where the cases are limited to those involving a deliberate and voluntary disclosure of a privileged communication to someone other than the attorney or client, the case law is far from settled. But decisions do tend to mark out, although not with perfect consistency, a small circle of "others" with whom information may be shared without loss of the privilege (e.g., secretaries, ____ interpreters, counsel for a cooperating co-defendant, a parent present when a child consults a lawyer).1  ____________________ 1See, e.g., United States v. Bay State Ambulance & Hosp. ___ ____ _____________ ___________________________ Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989); Kevlik __________________ ______ v. Goldstein, 724 F.2d 844, 849 (1st Cir. 1984); Indian Law _________ __________ Resource Center v. Department of the Interior, 477 F. Supp. _______________ __________________________ 144, 148 (D.D.C. 1979); J. Weinstein & M. Berger, Weinstein's ___________ Federal Evidence 503.08[2], at 503-36 (J. McLaughlin ed., ________________ 2d ed. 1997). -7- -7- Although the decisions often describe such situations as ones in which the client "intended" the disclosure to remain confidential, see, e.g., Kevlik v. Goldstein, 724 F.2d 844, ___ ____ ______ _________ 849 (1st Cir. 1984), the underlying concern is functional: that the lawyer be able to consult with others needed in the representation and that the client be allowed to bring closely related persons who are appropriate, even if not vital, to a consultation. Cf. Westinghouse Elec. Corp. v. ___ _________________________ Republic of the Philippines, 951 F.2d 1414, 1424 (3d Cir. ____________________________ 1991). An intent to maintain confidentiality is ordinarily necessary to continued protection, but it is not sufficient. On the contrary, where the client chooses to share communications outside this magic circle, the courts have usually refused to extend the privilege.2 The familiar platitude is that the privilege is narrowly confined because it hinders the courts in the search for truth. See Fisher v. ___ ______ United States, 425 U.S. 391, 403 (1976); 8 Wigmore, supra,  _____________ _______ _____ 2291, at 554. Fairness is also a concern where a client is permitted to choose to disclose materials to one outsider while withholding them from another. See, e.g., Permian ___ ____ _______ Corp. v. United States, 665 F.2d 1214, 1221 (D.C. Cir. 1981). _____ _____________  ____________________ 2In addition to the cases cited in note 3 below, see In ___ __ re Grand Jury Proceedings, 78 F.3d 251, 254 (6th Cir. 1996); _________________________ United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982); _____________ _____ In re Sealed Case, 676 F.2d 793, 818 (D.C. Cir. 1982); In re _________________ _____ Horowitz, 482 F.2d 72, 81 (2d Cir.), cert. denied, 414 U.S. ________ _____________ 867 (1973); McCormick on Evidence, supra, 93, at 347-48. _____________________ _____ -8- -8- Should this inclination not to protect a document disclosed outside the circle apply where, as here, the initial disclosure was to and at the request of a government agency? This problem has presented itself to six circuits. The most common cases have been disclosures of otherwise privileged attorney-client communications to the Securities and Exchange Commission by corporations during voluntary internal investigations or in response to SEC subpoenas. The Eighth Circuit, en banc but without more than a paragraph of _______ analysis, treated this kind of disclosure as not comprising a total waiver of the privilege. See Diversified Indus., Inc. ___ ________________________ v. Meredith, 572 F.2d 596, 611 (8th Cir. 1978) (en banc). ________ Subsequently, the Second, Third, Fourth, Federal and D.C. Circuits took the opposite view and ruled that such limited disclosures do destroy the privilege.3 The primary argument in favor of the Eighth Circuit position is that loss of the privilege may discourage the frank exchange between attorney and client in future cases, wherever the client anticipates making a disclosure to at least one government agency. We put to one side the interest of the government agency in obtaining voluntary disclosures;  ____________________ 3See Genentech, Inc. v. United States Internat'l Trade ___ ________________ _______________________________ Comm'n, 122 F.3d 1409, 1417 (Fed. Cir. 1997); In re ______ ______ Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993); __________________________ Westinghouse, 951 F.2d at 1424-26; In re Martin Marietta ____________ _______________________ Corp., 856 F.2d 619, 623-24 (4th Cir. 1988), cert. denied, _____ ____________ 490 U.S. 1011 (1989); Permian, 665 F.2d at 1220-21. _______ -9- -9- such agencies usually have means to secure the information they need and, if not, can seek legislation from Congress. By contrast, the safeguarding of the attorney-client relationship has largely been left to the courts, which have a comparative advantage in assessing consequences in this sphere. But MIT, like any client, continues to control both the nature of its communications with counsel and the ultimate decision whether to disclose such communications to third parties. The only constraint imposed by the traditional rule here invoked by the government--that disclosure to a third party waives the privilege--is to limit selective disclosure, _________ that is, the provision of otherwise privileged communications to one outsider while withholding them from another. MIT has provided no evidence that respecting this constraint will prevent it or anyone else from getting adequate legal advice. Admittedly, the arguments on the other side are far from overwhelming. The IRS' search for truth will not be much advanced if MIT simply limits or recasts its disclosures to the audit agency. But the general principle that disclosure normally negates the privilege is worth maintaining. To maintain it here makes the law more predictable and certainly eases its administration. Following the Eighth Circuit's approach would require, at the very least, a new set of -10- -10- difficult line-drawing exercises that would consume time and increase uncertainty. MIT says that even if we are not prepared to follow the Eighth Circuit onto new ground, MIT's disclosure to the audit agency should be regarded as akin to the disclosure by a client's lawyer to another lawyer representing another client engaged in a common defense. Invoking the concept of "common interest," MIT seeks to compare its situation to cases where disclosure has been allowed, without forfeiting the privilege, among separate parties similarly aligned in a case or consultation (e.g., codefendants, insurer and insured, ____ patentee and licensee).4 In a rather abstract sense, MIT and the audit agency do have a "common interest" in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills. But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients--who are working together in prosecuting or defending a lawsuit or in certain other legal transactions--can exchange information among themselves without loss of the  ____________________ 4Compare In re Regents of Univ. of Cal. 101 F.3d 1386, _______ _______________________________ 1390-91 (Fed. Cir. 1996), cert. denied, 117 S. Ct. 1484 ____________ (1997), and Hewlett-Packard Co. v. Bausch & Lomb, Inc., 115 ___ ____________________ ____________________ F.R.D. 308, 310 (N.D. Cal. 1987), and Roberts v. Carrier ___ _______ _______ Corp., 107 F.R.D. 678, 687-88 (N.D. Ind. 1985), with In re _____ ____ _____ Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 922-23 (8th _________________________________ Cir.), cert. denied, 117 S. Ct. 2482 (1997), and Linde _____________ ___ _____ Thomson Langworthy Kohn & Van Dyke, P.C., v. Resolution Trust ________________________________________ ________________ Corp., 5 F.3d 1508, 1515 (D.C. Cir. 1993). _____ -11- -11- privilege. To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, would be to dissolve the boundary almost entirely. MIT further argues that the disclosure to the audit agency was not "voluntary" because of the practical pressures and the legal constraints to which it was subject as a government contractor. The extent of those pressures and constraints is far from clear,5 but assuming arguendo that ________ they existed, MIT chose to place itself in this position by becoming a government contractor. In short, MIT's disclosure to the audit agency resulted from its own voluntary choice, even if that choice was made at the time it became a defense contractor and subjected itself to the alleged obligation of disclosure. See In re John Doe Corp., 675 F.2d 482, 489 (2d ___ _____________________ Cir. 1982). Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and say that, although the disclosure itself is not necessary to foster attorney-  ____________________ 5MIT's main citation for its duty to disclose is not to a statute or regulation but to a procedures manual maintained by the audit agency. There is no actual evidence that MIT would have been denied payment if it had sought to negotiate some lesser disclosure. -12- -12- client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path--which has no logical terminus--and we join in this reluctance. We add, finally, a word about reliance and fair warning. MIT may have had some reason to think that the audit agency would not disclose the documents to the IRS (and the agency did not do so). But MIT had far less reason to think that it could disclose documents to the audit agency and still maintain the privilege when IRS then sought the same documents. See note 3, above. The choice to disclose may ___ have been reasonable but it was still a foreseeable gamble. The IRS Appeal. We turn now to the government's cross- ______________ appeal. Here, the IRS challenges the district court's refusal to require MIT to produce three specific minutes. The refusal reflected the district court's view that the documents contained privileged material, and that there was no waiver because MIT had not been shown to have disclosed those minutes to the audit agency. On the latter point, MIT effectively concedes error, and properly so. Where privilege is claimed and the opponent alleges a specific disclosure, the burden of proof is upon the claimant to show nondisclosure wherever that is material to the disposition of the claim. Cf. United States v. Wilson, 798 ___ _____________ ______ F.2d 509, 512-13 (1st Cir. 1986). Here, MIT concedes that it -13- -13- cannot prove that the minutes in question were withheld from the audit agency. Instead, it proffers alternative grounds for sustaining the district court's judgment as to these minutes, namely, that the minutes were protected under the attorney-client privilege and the work product doctrine and that these protections were not waived even though the minutes were turned over to the audit agency.  A party may defend a judgment in its favor on any legitimate ground without appealing from the judgment on that issue. Martin v. Tango's Restaurant, Inc., 969 F.2d 1319, ______ ________________________ 1325 (1st Cir. 1992). Our discussion of the billing statements disposes of MIT's argument that the protection of the attorney-client privilege survived disclosure to the audit agency. We therefore turn to the work product doctrine. In doing so, we reject the government's claim that MIT waived this work product argument by only raising it in its reply brief; MIT's "reply" brief was effectively its answering brief on the government's cross appeal, and the government filed its own "reply" in turn. The district court assumed that work product protection did not apply because the minutes were not prepared "in anticipation of litigation," as required by Fed. R. Civ. P. 26(b)(3). MIT argues that the minutes contained substantive information that did represent attorney work product even if the minutes had a more general function. There is little law -14- -14- in this area--partly, one suspects, because work product usually remains embodied in documents unquestionably prepared for litigation or, if given to the client, in documents independently protected by the attorney client privilege.  The government has chosen in its brief to assume that, to the extent that the minutes contained "the mental impressions, conclusions, opinions, or legal theories" of MIT's attorneys, Fed. R. Civ. P. 26(b)(3), the district court erred in concluding that work product lost its protection when repeated in another confidential document not prepared in anticipation of litigation. A Third Circuit precedent supports this assumption, which MIT presses and the government does not resist. See In re Ford Motor Co., 110 ___ _____________________ F.3d 954, 967 (3d Cir. 1997). In view of the government's concession, we will take the point as settled for this case. Nevertheless, the government claims that any such protection was lost when the minutes were turned over to the audit agency, MIT having conceded that it cannot prove that the minutes were not so disclosed. One might wonder why the standard of waiver for the attorney-client privilege--that any voluntary disclosure outside the magic circle constitutes waiver--would not also apply to the work product doctrine. Equivalent waiver standards would make easier the resolution -15- -15- of evidentiary disputes where, as often happens, the two objections are raised together.  Nonetheless, the cases approach uniformity in implying that work-product protection is not as easily waived as the attorney-client privilege. The privilege, it is said, is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege; by contrast, work product protection is provided against "adversaries," so only disclosing material in a way inconsistent with keeping it from an adversary waives work product protection. At least five circuits have adopted this rule in some form.6 See also 8 C. Wright, A. Miller & R. ________ Marcus, Federal Practice and Procedure 2024, at 368-69 _______________________________ (1994) (citing cases). Perhaps such formulations simply beg the question. If one wanted to explain the discrepant outcomes, it might be more persuasive to say that the privilege is strictly confined because it is absolute; on the other hand, work product protection (with certain qualifications) can be overcome by a sufficient showing of need. See Fed. R. Civ. ___ P. 26(b)(3). In all events, it would take better reason than  ____________________ 6See Westinghouse, 951 F.2d at 1428-29; Steinhardt ___ ____________ __________ Partners, 9 F.3d at 234-35; In re Subpoenas Duces Tecum, 738 ________ ___________________________ F.2d 1367, 1371-75 (D.C. Cir. 1984); Martin Marietta Corp., ______________________ 856 F.2d at 625; In re Chrysler Motors Corp. Overnight _________________________________________ Evaluation Program Litig., 860 F.2d 844, 846-47 (8th Cir. __________________________ 1988). -16- -16- we have to depart from the prevailing rule that disclosure to an adversary, real or potential, forfeits work product protection. MIT's disclosure to the audit agency was a disclosure to a potential adversary. The disclosures did not take place in the context of a joint litigation where the parties shared a common legal interest. The audit agency was reviewing MIT's expense submissions. MIT doubtless hoped that there would be no actual controversy between it and the Department of Defense, but the potential for dispute and even litigation was certainly there. The cases treat this situation as one in which the work product protection is deemed forfeit. See, ____ e.g., Steinhardt Partners, 9 F.3d at 234; Westinghouse, 951 ____ ___________________ ____________ F.2d at 1428-31; In re Subpoenas Duces Tecum, 738 F.2d at _____________________________ 1372 (D.C. Cir. 1984). In closing, it may be helpful to stress that--with regard to both the attorney-client privilege and the work product doctrin ine--we are concerned only with loss of protection as to the very documents already disclosed to the audit agency. Nothing in this opinion is intended to be directed to the different and difficult question when disclosure of one document warrants forfeiture of protection for a different but related document. That issue was touched on in the district court but has not been pursued on appeal. -17- -17- Similarly, even where work product can be discovered, the governing rule directs that "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." Fed. R. Civ. P. 26(b)(3). Conceivably, the strong policy underlying this reservation might serve to protect such materials, even if protection of ordinary work product materials were deemed waived because of selective disclosure. This possibility has not been briefed or argued to us; it may or may not be pertinent in this case; and we mention it only to stress that we are not deciding the issue. Accordingly, on MIT's appeal, the judgment of the district court is affirmed. On the government's cross- ________ appeal, the judgment of the district court refusing to order production of three specified minutes is vacated, and the _______ matter is remanded to the district court for further ________ proceedings consistent with this opinion. It is so ordered. ________________ -18- -18-